**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| _____ | ) | |
| **ISAURA PENATE,** | ) | |
| | ) | **CIVIL ACTION** |
| **Plaintiff,** | ) | **NO.  4:19-40054-TSH** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **JOSEPH SCAMPINI, DANIEL F.** | ) | |
| **SULLIVAN, GARY J. GEMME, GEORGE** | ) | |
| **ADAMS, DONNA BRISSETTE, CITY OF** | ) | |
| **WORCESTER, and JOHN DOES 1-8,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**ORDER AND MEMORANDUM ON DEFENDANTS' MOTION FOR SUMMARY**
**JUDGMENT (Docket No. 58)**

**April 26, 2022**

**HILLMAN, D.J.**

In the early afternoon on April 12, 2016, Worcester Police Department officers executed a search warrant for an apartment in Worcester believed to be the location of an armed sexual assault that had occurred the night before.  Once inside the apartment, officers found the plaintiff, Isaura Penate, who was alone, visibly pregnant, and did not speak English.  While pointing their firearms at her, they grabbed her by the hand and brought her outside.  They then searched her apartment -- to no avail as far as the armed sexual assault was concerned -- and left after twenty to twenty-five minutes.

On April 11, 2019, the plaintiff commenced this action against several of the officers involved in the application and execution of the search warrant, as well as the City of Worcester (the "City").  Among the defendant officers are Detective George Adams, who applied for the

search warrant, Detective Daniel F. Sullivan, who led the team of officers executing the search warrant, and Detective Donna Brissette, who was present for the execution of the search warrant but did not enter the apartment until after it was secured.[1]

The plaintiff alleges that Detectives Sullivan, Adams, and Brissette are liable under 42 U.S.C. § 1983 for violating her constitutional right to be free from unreasonable search and seizure and excessive force (Count I); that Detective Sullivan committed the common law tort of assault and battery (Count III); that Detectives Sullivan, Adams, and Brissette committed the common law tort of intentional infliction of emotional distress (Count IV); and that the City is liable under M. G. L. c. 258, § 2, for carelessly and negligently seeking and accepting the search warrant for her apartment (Count V).[2]  The defendants move for summary judgment on all counts.  (Docket No. 58).  For the reasons set forth below, the Court ***grants*** their motion.

## Background

Around 2:30 A.M. on April 12, 2016, a resident at a rooming house on Main Street in Worcester called 911 to report that a woman wearing nothing but a t-shirt had arrived at the house and was asking for help because she had been raped.  Paramedics responded to the scene and transported the woman to a hospital.

---

[1] Defendant Joseph Scampini was dismissed from the action by agreement of the parties. (Docket No. 55).  The Court will dismiss defendant Gary Gemme, as the plaintiff has abandoned the only claim asserted against him.  The Court will also dismiss defendants John Does 1-8, as the plaintiff has neither identified nor served them.  *See Figueroa v. Rivera*, 147 F.3d 77, 82-83 (1st Cir. 1998).

[2] The plaintiff also alleges that the City and its Chief of Police, Gary Gemme, are liable under 42 U.S.C. § 1983 for failing to train, supervise, and discipline the officers (Count II); that the City violated the Massachusetts Public Records Law, M. G. L. c. 66, § 10 (Count VI); and that the City violated the Freedom of Information Act, 5 U.S.C. § 552 (Count VII).  Plaintiff's counsel confirmed at the hearing that the plaintiff is abandoning these claims.  *See Montany v. Univ. of New England*, 858 F.3d 34, 41 (1st Cir. 2017).  Accordingly, they will be dismissed.

Around 4 A.M., Worcester Police Department ("WPD") Detective Donna Brissette spoke with the woman at the hospital. The woman reported that she had been out with friends at a club in Worcester. After a fight broke out at the club, she asked two men, who had said they knew her brother, for a ride to her brother's home.

After spending some time at her brother's home, one of the men, whom the woman later learned went by the name, "Chino," said he was having a party at his place. The woman agreed to go with the men to the party. The woman and the two men drove in Chino's silver SUV to the Piedmont Street area of Worcester. They arrived at a building and went up to the third floor, where the men led the woman into a bedroom with black furniture. The woman asked the men about the party, and they told her that there were two other men getting ready in a bathroom.

The two men told the woman that they wanted to have sex with her; the woman declined. The men then tore off the woman's clothes and sexually assaulted her. During the assault, one of the men showed the woman a small, black handgun in the waistband of his pants. When the two men left to go get their friends, the woman grabbed a shirt and ran from the apartment.

The woman ran until she reached a church in the Preston/Piedmont/Main Street area and hid behind a van. She then ran to the rooming house on Main Street, where she met the resident who had called 911. At the hospital, the woman told Detective Brissette that she could identify the location of the assault. She described the area as being near Murray Avenue, between the YMCA and the Jacob Hiatt school. She also stated that she had left her clothes, wallet, and phone in the apartment where the assault occurred.

Around 10:30 A.M., Detective Brissette brought the woman to the area the woman had described. Once on Murray Avenue behind the YMCA, the woman directed Detective Brissette to turn right onto Preston Street. The woman then pointed to a house down the street on the left

and said, "It was that one."  Detective Brissette continued down Preston Street until they were in front of the house.  Detective Brissette confirmed that the house number was 22, and the woman said, "Yes, that's it."  The woman further pointed to a familiar-looking SUV parked in an adjacent lot.

Around 1:15 P.M., Detective Brissette obtained a signed statement from the woman's sister.  The woman's sister informed Detective Brissette that she had gone through Facebook and found Chino's name and photograph.  The sister reported that her mother had confirmed that the man in the Facebook photograph was someone she knew as Chino, and that her sister (the victim) had confirmed that the man in the Facebook photograph was one of the men who had attacked her.

That afternoon, WPD Detective George Adams applied for a warrant to search 22 Preston Street, Apartment 3, in Worcester, for clothes, a phone, a black handgun and other evidence of sexual assault.  Detective Adams averred that a woman who had reported being sexually assaulted on the third floor of a house in Worcester had identified 22 Preston Street as the location of the assault.  Around 1:55 P.M., an Assistant Clerk Magistrate of the Worcester District Court granted the application.  The warrant permitted officers to enter 22 Preston Street, Apartment 3, in the daytime, with announcement.  Officers did not seek to determine who lived at 22 Preston Street, Apartment 3, prior to obtaining the search warrant and, according to Detective Brissette, had no reason to believe that Chino lived there.  In Detective Brissette's view, however, because officers had reason to believe that the assault took place in the apartment, it did not matter who in fact lived there.

Because the woman had reported seeing a gun during the assault, officers requested assistance from the WPD SWAT Team for entry into the apartment.  Around 2:15 P.M., the WPD SWAT Team breached the outside door of 22 Preston Street and made their way up to Apartment

3 on the third floor.  Inside the apartment, the plaintiff, who was 38 weeks pregnant, was alone and napping.  WPD Detective Daniel Sullivan, who led the SWAT Team, testified at his deposition that officers knocked on the apartment door and announced, multiple times, in English and in Spanish, "Worcester Police."  In contrast, the plaintiff testified at her deposition that officers did not knock or identify themselves as officers prior to entering her apartment.  Detective Sullivan testified that, after hearing movement on the other side of the apartment door, the officers decided to enter.

The first officer to enter the apartment had his firearm drawn.  Other officers had side arms and "long guns," such as rifles or shotguns.  A hanging sheet separated the entry room from the kitchen and living quarters inside the apartment.  One of the officers reported that he could see an individual behind the curtain; the officer pointed his firearm at the individual and ordered the individual to raise their hands.

As the plaintiff moved the curtain to see into the entry room, a man grabbed her hand and pulled her in.  The men were asking for a person named Chino.  The plaintiff said she did not speak English.  The men, who "were well prepared like you see in the movies with little helmets, glasses and their machine guns," had their firearms pointed at the plaintiff.  According to the plaintiff, the men did not identify themselves as police officers.

The plaintiff, who was visibly pregnant, was passed off to Detective Sullivan, who, within one second, passed her to other officers outside of the apartment.  By the time the plaintiff was outside of the apartment, officers were no longer pointing their firearms at her.[3]

---

[3] At her deposition, the plaintiff testified that officers continued to point their firearms at her after she "came out," and that it was not until they took her "out to here" that they lowered their firearms.  The Court understands the plaintiff's testimony to be that officers continued to point their firearms at her after she came out from behind the curtain, and that it was not until they took her outside the apartment that they lowered their firearms.  The plaintiff later testified that

Detective Brissette entered the apartment after it was secured.  For a few minutes, officers searched the plaintiff's apartment for individuals who could pose a danger.  After two or three minutes, a WPD officer who spoke Spanish came out to speak to the plaintiff.  He told her that the men in her apartment were police officers, and that they were searching for a phone, a chain, a gun, and a room that was painted black.  After the plaintiff reported that she was not feeling well, the Spanish-speaking officer took her back into the apartment, and she was able to sit down.  At some point, Detective Brissette showed the plaintiff the Facebook photograph that the woman's sister had identified as Chino; the plaintiff reported that she did not know, and had never seen, the person in the photograph.  Plain clothes officers stayed in the plaintiff's apartment for approximately twenty to twenty-five minutes before leaving.

The plaintiff was due to give birth two weeks later, on April 26, 2016.  When police arrived at her apartment, however, she started experiencing contractions.  While police were there, her water broke.  After the police left, she went to the hospital.  She gave birth the following morning. The plaintiff testified that, in the aftermath of incident, she had anxiety, depression, nightmares, and insomnia.  A doctor later diagnosed her with post-traumatic stress disorder.

The plaintiff commenced this action on April 11, 2019, against the City and several of the officers who were involved in the application and execution of the search warrant for her apartment.  The defendants move for summary judgment on all claims.

### Legal Standard

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

---

after being taken outside of her apartment, a detective in plain clothes spoke to her in English. After the officers took her "out here," it was two or three minutes before the Spanish-speaking officer came out.

judgment as a matter of law." An issue is "genuine" when a reasonable factfinder could resolve it in favor of the nonmoving party. *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994). A fact is "material" when it may affect the outcome of the suit. *Id.* When ruling on a motion for summary judgment, "the court must view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Scanlon v. Dep't of Army*, 277 F.3d 598, 600 (1st Cir. 2002) (citation omitted).

## Discussion

### 1. Excessive Force

In Count I, the plaintiff alleges that Detectives Sullivan, Adams, and Brissette violated her constitutional right to be free from unreasonable searches and seizures, as well as excessive force. In opposition to the defendants' motion for summary judgment, the plaintiff contends that the officers subjected her to excessive force by pointing firearms at her while they removed her from her apartment.

"Excessive force claims are founded on the Fourth Amendment right to be free from unreasonable seizures of the person." *Raiche v. Pietroski*, 623 F.3d 30, 36 (1st Cir. 2010). Thus, to make out an excessive force claim, "a plaintiff must show, as an initial matter, that there was a seizure within the meaning of the Fourth Amendment, and then that the seizure was unreasonable." *Stamps v. Town of Framingham*, 813 F.3d 27, 35 (1st Cir. 2016). Here, the defendants do not dispute that the plaintiff was seized within the meaning of the Fourth Amendment.

"Whether a seizure is reasonable depends on 'the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Mlodzinksi v. Lewis*, 648 F.3d 24, 34 (1st Cir. 2011) (quoting *Graham v. Connor*,

490 U.S. 386, 396 (1989)).  To prevail, "a plaintiff must show that the defendant employed force that was unreasonable under all the circumstances." *Morelli v. Webster*, 552 F.3d 12, 23 (1st Cir. 2009).

In certain circumstances, an officer's act of pointing a firearm at an individual may constitute excessive force. *See Stamps*, 813 F.3d at 39-41 (concluding that a jury reasonably could find that an officer used excessive force during the execution of a search warrant by "pointing [a] loaded assault rifle at the head of a prone, non-resistant, innocent person who present[ed] no danger, with the safety off and a finger on the trigger"); *Mlodzinski*, 648 F.3d at 37-50 (concluding that a jury reasonably could find that officers used excessive force during the execution of a search warrant by holding a mother and daughter at gunpoint for an extended period); *Lucas v. City of Boston*, 2009 WL 1844288, at *19 (D. Mass. Jun. 19, 2009) (concluding that a jury reasonably could find that officers used excessive force during execution of arrest warrant by pointing firearms at the heads of two young children).

In other circumstances, however, an officer's act of pointing a firearm at an individual is reasonable. *See Los Angeles County v. Rettele*, 550 U.S. 609, 614 (2007) (concluding that it was reasonable for officers executing a search warrant to order a couple out of bed and hold them at gun point for approximately one to two minutes); *Muehler v. Mena*, 544 U.S. 93, 96-98 (2005) (concluding that it was reasonable for a SWAT Team executing a search warrant to enter a woman's residence early in the morning while she was asleep and place her in handcuffs at gun point); *Schubert v. City of Springfield*, 589 F.3d 496, 503 (1st Cir. 2009) (concluding that an officer acted reasonably when, in justifiably stopping an unknown man with a gun outside a courthouse, the officer "emerged quickly from his vehicle, drew his gun, executed a pat-frisk, requested identification and a gun license, attempted to confirm the validity of the licenses, and escorted [the

man] into the cruiser after [the man] moved from the position in which the officer had instructed him to remain"); *Flowers v. Fiore*, 359 F.3d 24, 30 (1st Cir. 2004) (concluding that it was reasonable for officers conducting an investigatory stop in response to a report of an armed threat to draw their firearms and, upon restraining the suspect, immediately holster their weapons); *Diaz v. Devlin*, 2019 WL 4804803, at \*5 (D. Mass. Sept. 30, 2019) (finding it not unreasonable for officers executing a search warrant to have pointed a rifle at man, ordered the man to the ground, and handcuffed the man for a period of one minute until the man was brought elsewhere).

Here, viewing the facts in the light most favorable to the plaintiff, the WPD SWAT Team, including Detective Sullivan, entered the plaintiff's apartment without announcing their presence. They had their firearms drawn and, upon seeing an individual behind a curtain, ordered the individual to raise their hands. When the plaintiff was pulled out from the behind the curtain, officers kept their firearms raised and pointed at her. Within a short matter of time, however, the plaintiff was passed from one officer to another until she was outside of the apartment. The plaintiff was in Detective Sullivan's proximity for no more than one second.

Detective Adams and Detective Brissette were not involved in the initial entry into the plaintiff's apartment, and the record does not indicate that either detective pointed a firearm at the plaintiff. Accordingly, summary judgment is warranted as to them.

Detective Sullivan was involved in the initial entry into the plaintiff's apartment, and he pointed his firearm at the plaintiff until she was brought outside of her apartment. Under these circumstances, Detective Sullivan's actions were not unreasonable. Officers were executing a search warrant in response to a reported sexual assault involving a firearm. *See Rettele*, 550 U.S. at 614 (reasoning that officers were justified in holding a couple at gun point in part because the officers were looking for a suspect who was known to own a firearm). When they saw a figure

behind the curtain, they were justified in temporarily raising their weapons. *See Flowers*, 359 F.3d at 30. Although, in the plaintiff's telling, officers did not immediately lower their weapons upon seeing that she posed no threat, officers quickly took her out of the apartment, where she remained for the duration of the search, without handcuffs and without any weapons pointed at her. *See Mlodzinski*, 648 F.3d at 40 (noting that, although a jury reasonably could find that officers used excessive force by pointing an assault rifle at a woman's head for up to half an hour, "the situation would be very different if, given the execution of these warrants, [the woman] had been detained with a weapon pointed at her for only a very short period needed while she was being cuffed"). Given the violent nature of the crime into which the officers were investigating, and the brief duration of Detective Sullivan's actions directed toward the plaintiff, no reasonable jury could conclude that Detective Sullivan used excessive force.

The fact that the officers did not announce their presence prior to entering the plaintiff's apartment does not change the result. Although the warrant required officers to announce their presence, the reasonableness of a no-knock entry is assessed at the time of entry, not at the time the warrant application is made. *See United States v. Boulanger*, 444 F.3d 76, 83-84 (1st Cir. 2006). To justify a no-knock entry, officers "must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the investigation of the crime by, for example, allowing the destruction of evidence." *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997). Here, given that the officers were executing a search warrant for an apartment in which they had reason to believe a rape had occurred approximately twelve hours earlier, and given that they had reason to believe one of the rapists was armed, it would not have been unreasonable for the officers to have entered without knocking -- as the plaintiff contends -- due to concerns for their safety.

10

Moreover, even if the officers violated the knock-and-announce rule,[4] they were nonetheless confronted with an individual behind a curtain in response to a reported armed sexual assault that had occurred in the apartment the night before.  Officers pointed their firearms at the figure -- soon discovered to be the plaintiff -- only briefly as they brought her outside the apartment.  Whether or not officers announced their presence, or identified themselves as officers to the plaintiff, no reasonable jury could find that Detective Sullivan's brief actions towards the plaintiff constituted excessive force.  Finally, even if a jury reasonably could find that Detective Sullivan's actions constituted excessive force, Detective Sullivan is entitled to qualified immunity.  It would not have been clear to a reasonable officer at the time of the incident that Detective Sullivan's actions violated the plaintiff's constitutional rights.  *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Decotiis v. Whittemore*, 635 F.3d 22, 37 (1st Cir. 2011).  Thus, summary judgment is warranted as to Detective Sullivan.

### 2.  Assault and Battery

In Count III, the plaintiff alleges that Detective Sullivan is liable for the common law tort of assault and battery.  Where, as here, a plaintiff brings both a § 1983 excessive force claim and a common law claim for assault and battery, the reasonableness of the force used with respect to the § 1983 claim controls the assault and battery analysis.  *See Raiche*, 623 F.3d at 40.  Because the Court concludes that no reasonable jury could find that Detective Sullivan used excessive force in executing the search warrant, summary judgment is warranted on the plaintiff's assault and battery claim as well.  *See Diaz*, 2019 WL 4804803, at *6.

---

[4] The plaintiff does not argue that Detective Sullivan's failure to knock and announce constituted a Fourth Amendment violation separate and apart from his alleged excessive force, but even if she had, Detective Sullivan would have been entitled to qualified immunity, because it is at least questionable whether, given the potential safety concerns, Detective Sullivan was constitutionally required to knock and announce.  *See Lucas*, 2009 WL 1844288, at *17.

### 3. *Intentional Infliction of Emotional Distress*

In Count IV, the plaintiff alleges that the Detectives Sullivan, Adams, and Brissette's actions constituted intentional infliction of emotional distress. "The standard for making a claim of intentional infliction of emotional distress is very high." *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 195 (1st Cir.1996). The plaintiff must show that the defendant's conduct was extreme and outrageous. *See Sena v. Commonwealth*, 629 N.E.2d 986, 994 (Mass. 1994). "Conduct qualifies as extreme and outrageous only if it 'go[es] beyond all possible bounds of decency, and [is] regarded as atrocious, and utterly intolerable in a civilized community.'" *Polay v. McMahon*, 10 N.E.3d 1122, 1128 (Mass. 2014) (quoting *Roman v. Trustees of Tufts College*, 964 N.E.2d 331, 341 (Mass. 2012)). As explained above, Detective Sullivan's conduct in executing the search warrant was not unreasonable. The same holds for Detective Brissette, who was present for the execution of the search warrant and entered only after the apartment was secured. Detective Adams's conduct in applying for the search warrant, moreover, was not unreasonable, as he had information that the plaintiff's apartment had been identified as the scene of sexual assault that occurred the night before. It follows that the detectives' conduct did not exceed all possible bounds of decency. Accordingly, summary judgment on the plaintiff's intentional infliction of emotional distress claim is warranted. *See Dean v. City of Worcester*, 924 F.2d 364, 369 (1st Cir. 1991).

### 4. *Massachusetts Tort Claims Act*

In Count V, the plaintiff alleges, pursuant to M. G. L. c. 258, § 2, that the City, through the WPD and its officers, carelessly and negligently evaluated the existence of probable cause to search the plaintiff's apartment, and carelessly and negligently accepted the warrant despite a lack of probable cause. Under the Massachusetts Tort Claims Act, "Public employers shall be liable for injury or loss of property or personal injury or death caused by the negligent or wrongful act

or omission of any public employee while acting within the scope of his office or employment." *See* M. G. L. c. 258, § 2.

The defendants argue, first, that the WPD was not negligent in seeking and obtaining a search warrant for the plaintiff's apartment. Indeed, a jury would be hard pressed to find that the City was negligent. Probable cause exists where, based on the facts and circumstances, a reasonable person would be warranted in the belief that a crime has been committed. *See Commonwealth v. Rousseau*, 990 N.E.2d 543, 554 (Mass. 2013). To establish probable cause to search an individual's residence, officers must offer a "substantial basis for concluding that evidence connected to the crime will be found on the specified premises." *Commonwealth v. Donahue*, 723 N.E.2d 25, 28 (Mass. 2000). Here, a woman reported being raped earlier that morning. She directed Detective Brissette to the plaintiff's apartment and said, "It was that one." She reported that one of her assailants had a gun, and that, in her rush to escape, she left her phone and clothes. Although the WPD had identified a potential suspect and did not have reason to believe that the suspect in fact lived in the plaintiff's apartment, the fact that the woman identified the apartment as the location of the assault -- mere hours after the assault occurred -- plainly established probable cause to search the plaintiff's apartment.

The defendants contend, second, that the plaintiff's negligence claim against the City is barred by M. G. L. c. 258, § 10(b), which prevents a public employer from being held liable for "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a public employer or public employee, acting within the scope of his office or employment, whether or not the discretion involved is abused."

To determine whether a government actor exercised a discretionary function, the Court must determine, first, "whether the government actor had any discretion as to what course of

conduct to follow," and second, "whether the discretion that the actor had is that kind of discretion for which § 10(b) provide immunity from liability." *Sena*, 629 N.E.2d at 990 (quoting *Harry Stoller & Co., Inc. v. City of Lowell*, 587 N.E.2d 780, 782-83 (Mass. 1992)).  As it relates to the second step, discretionary actions that warrant immunity are those "based on considerations of public policy." *Id.* (quoting *Harry Stoller & Co.*, 587 N.E.2d at 784).  Acts which involve "the carrying out of previously established policies or plans," by contrast, do not warrant immunity. *See Irwin v. Town of Ware*, 467 N.E.2d 1292, 1299 (Mass. 1984) (quoting *Whitney v. City of Worcester*, 366 N.E.2d 1210, 1216 (Mass. 1977)).

Here, the officers had discretion in deciding whether and when to pursue a search warrant for the plaintiff's apartment.  *See Sena*, 629 N.E.2d at 990.  The officers' decision to do so, moreover, was based on considerations of policy.  *See Opalenik v. LaBrie*, 945 F. Supp. 2d 168, 196 (D. Mass. 2013); *see also Doherty v. United States*, 905 F. Supp. 54, 56 (D. Mass. 1995) (concluding that actions of law enforcement in preparing a search warrant were discretionary within the meaning of the Federal Tort Claims Act).

The decisions involved in seeking a search warrant are like the decisions involved in seeking an arrest warrant, *see Sena*, 629 N.E.2d at 990, where officers must make decisions regarding whether, when, and how, to investigate a crime.  These decisions necessarily implicate policy considerations, and thus, are discretionary within the meaning of M. G. L. c. 258, § 10(b). By contrast, the decisions involved in seeking a search warrant are unlike the decisions involved in executing a search warrant, *see Carr v. Metro. Law Enforcement Council*, Inc., 2014 WL 4185482, at *12 (D. Mass. Aug. 20, 2014), or in removing an intoxicated driver form the roadways, *see Carleton v. Town of Framingham*, 640 N.E.2d 452, 454-55 (Mass. 1994); *Irwin*, 467 N.E.2d at 1299, where officers must act pursuant to a predetermined plan or policy.  Those decisions are

ad hoc and based on the particular situation confronting the officer, not broader law enforcement objectives.  *See Horta v. Sullivan*, 638 N.E.2d 33, 36-37 (Mass. 1994).  Because the plaintiff is asserting negligence in the officers' seeking and acceptance of the search warrant, and not in the officers' execution of the search warrant, the City is immune from liability under M. G. L. c. 252, § 10(b), and summary judgment is warranted.

<u>Conclusion</u>

For the reasons stated, the defendants' motion for summary judgment (Docket No. 58) is ***<u>granted</u>***.

**SO ORDERED**

***<u>/s/ Timothy S. Hillman</u>***
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**